Motion to dismiss appeal denied September 25, 1917, argued on the merits March 21, affirmed April 29, 1919.

# TOKAY HEIGHTS DEVELOPMENT CO. v. HULL.

### (167 Pac. 577; 180 Pac. 314.)

**Appeal and Error—Undertaking—Service—Evidence.**

1. Notice of appeal was served and filed in the Circuit Court on July 28th. On August 1st an undertaking was filed, with the certificate of the return of the sheriff indorsed thereon, to the effect that it was received on July 31st, and served on respondent August 1st, together with a copy of the notice of appeal. The sheriff while making an affidavit that he served no papers pertaining to the appeal, after service of notice of appeal on July 28th, deposed that on July 28th appellants' attorney placed in his hands some papers relating to the appeal for service, and that he immediately served the same, and that, if an undertaking was delivered to him, he served it. Affidavits of the agent of the surety on the undertaking and witnesses showed that it was signed July 28th, although it erroneously bore the date July 30th, and that it was delivered to the sheriff for service on July 28th. *Held*, that the return of service of the undertaking, being of record, was sufficient, as it was not overcome by the affidavits.

**Appeal and Error—Review—Merits.**

2. On a motion to dismiss defendants' appeal, a question as to their dealing with the property in suit involves the merits, and cannot be considered.

### ON THE MERITS.

**Mortgages—Sale of Land—Representations—Means of Knowledge.**

3. Where defendants, before making a contract for land, had received and relied upon favorable statements of their friend, this amounted to making an independent investigation, and where the means of knowledge were at hand for defendants' inspection during a period of three years between the original contract and the new contract embodying the note and mortgage sought to be foreclosed, defendants are not entitled to relief on the ground of fraudulent representations.

**Appeal and Error—Review—Findings of Trial Court—Conclusiveness.**

4. Findings of the trial judge upon the defense of fraudulent misrepresentations of the quality and character of lands sold, based on evidence of witnesses who testified before the judge, resulting in a substantial conflict with respect to material issues, must be given great weight, particularly where the judge visited and inspected the premises.

From Josephine: FRANK M. CALKINS, Judge.

On respondent's motion to dismiss appeal. MOTION
DENIED.

*Mr. O. S. Blanchard,* for the motion.

*Messrs. Blanchard & Blanchard* and *Mr. Alfred E.
Reames, contra.*

In Banc.

BEAN, J.—The plaintiff moves to dismiss this appeal for failure to serve an undertaking. The defendant moves to correct the return of the sheriff to show the true date of the service of a copy of the undertaking on appeal. A decree was rendered on June 2, 1917. On July 28th, notice of appeal was served and filed in the Circuit Court. On August 1st, an undertaking on appeal was filed with the certificate of the return of the sheriff indorsed thereon to the effect that the same was received by him on July 31, 1917, and served upon the respondent company on August 1, 1917, together with a copy of the notice of appeal. The transcript was filed in this court on August 30, 1917, containing a copy of the decree appealed from, the notice of appeal with return of service thereof, and a copy of the undertaking with no proof of its service. On August 31st, and within the time allowed for filing the transcript herein, a copy of the undertaking on appeal with the return of service by the sheriff indorsed thereon was filed in this court.

1. It is the contention of the respondent that the undertaking on appeal was never served and that the transcript was prematurely filed before any such service. The sheriff makes affidavit on behalf of the plaintiff that he served no papers in the case pertaining to the appeal after the service of the notice of

appeal on July 28, 1917, and that no undertaking on appeal was served by his office on August 1, 1917, or at any time. For the defendants the sheriff makes a further affidavit in explanation and to the effect that on July 28, 1917, Paul E. Blanchard, attorney for defendants, placed in his hands some papers relating to this appeal for service upon the plaintiff; that he does not remember what they were, and that he immediately served the same; that if an undertaking on appeal was given him he served it. It is shown by the affidavits of Paul E. Blanchard, of the agent of the surety company who signed the bond, and of two witnesses thereto, that the undertaking on appeal was signed on July 28, 1917, although it bears the erroneous date of July 30th, which was the cause of an error as to date in the return of service of the same. Mr. Blanchard further deposes that he placed copies of the notice of appeal and undertaking in the hands of the sheriff on July 28, 1917, for service upon the plaintiff. The return of the sheriff of the service of the undertaking on appeal is not overcome or refuted. The proof of service is of record and is sufficient.

2. The motion also relates to the dealing of the defendants with the property involved. This matter pertains or is closely related to the merits of the case and should not now be considered. The motion to dismiss is denied and the defendants allowed to correct the return of the sheriff as to the date of service of the undertaking on appeal.   Motion Denied.

92 Or.—11

Affirmed April 29, 1919.

On the Merits.

(180 Pac. 314.)

Department 1.

The plaintiff instituted this suit to foreclose a mortgage given to it by the defendants upon certain subdivisions of a property laid out by the plaintiff adjoining Grants Pass in Josephine County. The giving of the note and mortgage in question is practically admitted but the defendants contend in substance that on account of certain fraudulent representations they allege were made by the plaintiff, which are more fully hereinafter set forth, those instruments are void and nothing is due upon them. The essence of the defense is that the defendants were residing in Kansas City, Missouri, in October, 1911, and contracted with the plaintiff, which had a local office there, to buy certain lots in the tract mentioned, now subject to the mortgage in question; that afterwards they agreed to buy other lots and still later took deeds for the property and gave to the plaintiff two notes and mortgages, one set of them being that in suit. They charge that the only object they had in acquiring any of the premises was to use them for the purpose of growing commercially certain varieties of pears, which were then planted on the land, and about an acre of grapes, then also planted. It is admitted by the defendant Hull in his testimony that the lots he contracted for in October, 1911, were not set to trees at that time but were afterwards planted to different varieties of his own choosing. They say:

"That in order to successfully grow said varieties of fruit it was necessary, and the defendants believed

it to be necessary, that the soil upon which said fruit was to be grown should be exceedingly fertile and rich and of great depth, and suitable for the growing of the fruits of the varieties named, all of which facts were at all the times herein mentioned well known to the plaintiff."

Further averments of fraud appearing in the answer are here set down:

"That in order to induce the defendants to purchase said premises the plaintiff then and there on and prior to October 31, 1911, falsely and fraudulently represented to the defendants that all of said premises were of the character of land above described, and had been, under the advice of those possessing scientific knowledge upon said subject, planted to said varieties of fruit. And as a part of said transaction and with said fraudulent intent and purpose the plaintiff falsely represented to the defendants that that portion of said premises known as valley lands, was a black loam, and that portion of said lands which was sloping was a red shot soil, and that all of said lands were of great depth and inexhaustible fertility and were especially adapted to the growing of said fruits. That each and all of said representations so made for said purpose were false, fraudulent and untrue, in this: that not more than four acres of said lands known as valley lands, out of 20 acres thereof, were black loam and none of the said sloping lands were what is known as red shot soil; nor were any of said lands of great depth or great fertility; nor were any of the same of sufficient depth or fertility for the proper growing of said varieties of fruit; all of which facts were at all the times herein mentioned, well known to the plaintiff.

"That at said time and as a part of said transaction and for the purpose of inducing the said defendants to purchase said premises, the plaintiff falsely and fraudulently represented to the defendants that the said purchase price of said premises, respectively, was much lower than the real value of said premises and that if the defendants purchased the same, they would

within three years after such purchase make a profit upon said transaction of 300 per cent, all of which representations were not only false and untrue, but were known to the plaintiff at the time they were made to be false, fraudulent and untrue, in this: that the purchase price of said premises, respectively, was greatly in excess of the true value thereof; that said premises were not adapted to the growing of the varieties of fruits to which the same were planted, and for which they were purchased, and said premises could not be operated at any profit, or other than at a loss, all of which facts were, at all the times herein mentioned, known to the plaintiff.  That as a part of said transaction and in order to induce said defendants to purchase said ·premises the plaintiff falsely and fraudulently represented to the defendants that if they would purchase said premises at said prices said investment would increase in value within three years to the amount of 300 per cent without the expenditure of any additional money or the making of any additional improvements thereon, which statement was false, fraudulent and untrue and was known by the plaintiff at the time the same was made to be false, fraudulent and untrue.''

As their principal grievance they charge in substance that the soil on all the premises is shallow, that a considerable portion of it is underlaid with solid bedrock covered with a soil ranging in depth from two to ten inches while other portions are said to be composed of hard-pan impervious to water and covered with a soil ranging from twelve to eighteen inches in depth.  They say that in order to plant the premises to orchard the plaintiff found it necessary to use powder for the purpose of blasting holes in which to plant the trees, which facts were not known to the defendants until the summer of 1916.  They claim not to have discovered the falsity of the alleged representations until the summer of 1916, when they ten-

dered a deed reconveying the property to the plaintiff and demanded the return of the money they had paid and the value of certain lands in Kansas City which they had conveyed in part payment of the purchase price of the lands in controversy.

The charges of fraudulent representation are denied by the reply. That pleading admits the use of the powder for the purpose of blasting holes in part of the land but says that fact was known to the defendants in the fall of 1911. This knowledge is established by unchallenged written testimony.

The Circuit Court heard the case; the trial judge made two personal examinations of the premises; and after full hearing made a decree denying relief to the defendants and foreclosing the mortgage substantially as prayed for in the complaint. The defendants appealed. As the defendant, Daniel Hull, appears to be the sole actor on behalf of himself and wife the opinion, for convenience of designation, will be written as if he were the only defendant.

AFFIRMED.

For appellants there was a brief over the names of *Mr. Alfred E. Reames* and *Messrs. Blanchard & Blanchard,* with an oral argument by *Mr. Reames.*

For respondent there was a brief over the names of *Mr. H. D. Norton* and *Mr. O. S. Blanchard,* with an oral argument by *Mr. Norton.*

BURNETT, J.—We note at the outset that the first contract for the purchase of the property was made October 31, 1911. The mortgage which the plaintiff would foreclose in this suit was dated April 1, 1915. The testimony shows that the defendant was engaged in teaching in Kansas City and owned and resided

upon a five-acre tract there, which was mainly covered with orchard which he personally superintended. He had read considerably on the subject of soils and orchards, all of which left him no tyro as a horticulturist. He had a friend named Hart who traveled extensively in the northwest looking for orchard lands and examined various parcels of realty supposed to be adapted for horticulture and personally inspected the property of the plaintiff which it had laid out to sell for orchard tracts. He gave it thorough, independent investigation, and, returning to Kansas City, informed Hull that it was the best proposition he had seen in all his journey. The plaintiff had a branch office in that city so Hull secured from it a printed circular describing the whole property of the plaintiff. The statements in that document cover everything which the defendants rely upon as fraudulent. After a glowing description of the Rogue River Valley and the statement that "Tokay Heights," comprising 160 acres, adjoins the city limits of Grants Pass and lies on a gradual southwesterly slope, it makes the following statement:

"Our valley land is a black loam of great depth and inexhaustible fertility. The sloping ground is of the rich, red shot variety so desirable for certain fruits such as Bartlett and D'Anjou pears, Tokay grapes, peaches, cherries, English walnuts, etc., but while the different soils are each particularly adapted to certain cultures any acre on our tract will produce almost any variety of fruit or vegetable. On the advice of several expert horticulturists we have decided that for commercial purposes we shall plant Bartlett and D'Anjou pears and Tokay grapes and around each building site, for family use, an assorted variety of cherries, peaches, apples, etc. However, we shall be pleased to plant whatever varieties of trees the individual customer may select on tracts not already set out at time of purchase."

Other statements here follow:

"We offer you acres adjoining the city limits for less than you can buy other acres several miles from town. You have two sure sources for enormous profit; as your orchard grows it becomes valuable; as the city grows Tokay Heights will become the choicest residence district. If you buy a tract and forget you have it, it should make you 300 per cent in three years. If you live on Tokay Heights you have the double advantage of city and country, a self-supporting home with magnificent surroundings."

After making the contract in Kansas City in October, 1911, the defendant came to Oregon unannounced and going to Grants Pass went upon the premises and gave them personal examination. He was so well pleased with the prospect that he wrote many letters to his friends in Missouri urging them to purchase property in the same tract. He also contracted for additional acreage there. Still later he secured a position in the public schools of Grants Pass, within three fourths of a mile of the property, and had every opportunity to examine the premises. In fact, he afterwards took up his residence upon the property, and took active part in the care and management of the growing orchard. For instance, under date of July 3, 1912, in writing to the Kansas City agent of the plaintiff, Hull says:

"Tokay Heights is far the best young orchard I have seen. The trees show much greater growth than I thought possible in one year. Your brother has a gang of men and teams working among the trees every day, some cultivating, others pruning and spraying, so that the condition of the trees is fine. Among the trees potatoes, cabbage, melons and beans are growing and show the rich, fertile nature of the soil. Mr. Burke, the County Fruit Inspector, told me this Tokay Heights orchard is the best for its age in the county, and I have seen none better. I found the best

cherry, peach and grape ranches on the hill slopes. Right adjacent to Tokay Heights on the north is a three year old Tokay grape vineyard and each vine will average ten or twelve great bunches. All the north end of Tokay Heights above the ditch is rich, strong fruit land as well as sightly home sites. One great advantage of hillside orchards is immunity from spring frosts. They never have to 'smudge' as on the river bottom land. As you know, I have both hill and bottom lands and I am mighty well pleased with the selection we have made, in fact no mistake can be made in selecting from the Tokay Heights orchards without seeing them."

The letter proceeds in similar optimistic strain, but is too long for full rehearsal. With full opportunity for thorough examination of the premises, and after all the inspection he chose to make, without any hindrance or concealment on the part of the plaintiff, the defendant continued in his expressions of approval of the property through a long series of letters appearing in evidence.

At the trial substantially the entire effort of the defendant was to show that the greater part of the tracts were underlaid with hard-pan and that bedrock came very close to the surface in many places. Some experienced orchardists were called from Jackson County to examine the lands and gave it as their opinion that they were not suitable for commercial orchards. A larger number of other orchardists, some of them from Jackson County and others from the immediate neighborhood, gave it as their opinion that the lands were suitable for a commercial orchard, and some of them praised them as the best lands for the purpose in the Rogue River Valley.

The land, as Hull stated, is composed partly of what may be termed bottom land and partly of side-hill land The testimony shows, without dispute, that in planting

trees on the upper tracts powder was used in the bottom of the holes dug for planting so as to loosen up the underlying strata. This fact was communicated to Hull in the fall of 1911 and some witnesses declare it to be good practice in planting any orchard. The defendants contend that the bedrock in places crops out and at others is but a few inches below the surface on the side-hill part of the premises. The contention on the part of the plaintiff is that while it is true there are some outcroppings of bedrock, especially in the road, yet it was a condition readily observable under the most casual inspection. As to the hard-pan, the witnesses differ not only as to the fact of there being any hard-pan but also as to the effect it has, especially in the present instance.

The testimony for the defendants comes largely from witnesses who dug into the ground at various depths from twelve to thirty inches and came to a layer of hard ground which they denominated "hard-pan." The witnesses for the plaintiff described this stratum as penetrable by roots and moisture. One of them testified to having dug further in one of the test holes sunk by the defendants' witnesses and says he had no difficulty in removing the so-called "hard-pan" by aid of a shovel. Others testify that they found roots growing in that layer, that it was about eight or ten inches in thickness and that under it was good, rich soil. The testimony shows that originally the ground was covered with a rich growth of trees and underbrush which the plaintiff claims demonstrates that it was suitable for tree growth. It also produced testimony to the effect that its officers consulted with experienced orchardists respecting the availability of the site for horticultural purposes and that it was under such expert advice that the tract was laid out and exploited as good orchard ground. The testimony also

shows that thrifty orchards are growing on similar land adjacent to the premises. It is to be noted, in passing, that no fraud is charged as immediately affecting the execution of the mortgage in suit, but that the deceit charged is founded solely upon the representations of the printed circular, to which allusion has already been made, which the defendants claim directly induced them to enter into the original contract for the purchase. It is proper also to remember that an interval of three years and three months elapsed between the making of the contract and the taking of the conveyance and giving the return mortgage.

After giving evidence of the unfitness of the ground for orchard purposes much testimony was put in by the defendants to the effect that many of the trees were either dead or dying of what is called "sour, sap." The witnesses on both sides are unanimous in saying that this condition is not peculiar to any class of land in Southern Oregon. It is no respecter of premises but appears alike on shallow and deep soils. Some of the witnesses for the defendants endeavored to account for it by defective drainage. We think the preponderance of testimony is to the effect that it may be ascribed to climatic conditions. It seems that when a sudden flow of sap is stimulated in a young tree either by warm rains, after it has lain dormant through a summer's drougth, or by warm weather in late winter or early spring, a succeeding spell of cold weather causes the sap to ferment and sour with the result that the new shoots perish. The root system is not necessarily disturbed at first and the tree may be saved in many instances by thoroughly cutting out the affected portions and allowing the root system to send up nourishment for the remainder and for such new growth as may appear. Of course orchards, especi-

ally in the earlier stages, are affected by cultivation, the lack of which will depreciate the plant. There is testimony to the effect that Hull's cultivation of his orchard was neglected and the photographs in evidence show orchards on adjoining lands which are growing well while the orchard of the defendants shows lack of care. It is stated in the report of the testimony also that the growing of potatoes in part of the orchard attracted gophers which remained to feast on the tender roots of the trees with fatal results to many trees without fault of the plaintiff.

Without going into detail, a perusal of the correspondence of the defendant Hull which is in the evidence shows that he started into the enterprise with roseate hopes; that he had ample opportunity to inspect the premises; that he did examine them and wrote in glowing terms of their excellence, and it was not until after the suit was commenced that he began to sink test holes and claims to have discovered the hard-pan and bedrock. His letters indicate that as time passed his visions grew less brilliant. He complains of long, dry summers, of lack of rain and other drawbacks preventing success, but does not intimate any hint of fraud until after the foreclosure suit was instituted.

The principal case cited by the defendants is that of *Vanderbilt* v. *Bishop,* 188 Fed. 971, in which Judge Wolverton had before him a case where the defendant in a suit for strict foreclosure of a contract to purchase an orchard in Hood River County set up by way of cross-bill misrepresentation and fraud on the part of the plaintiff and his agent, the essence of which is that in response to a direct question about whether or not there was hard-pan in the soil the plaintiff directly and specifically stated there was none, when the fact was otherwise. The case is different in its details

from the one before us, but we here repeat some principles of law announced in the cases quoted by the learned judge in his decision:

"The misrepresentation which will vitiate a contract of sale and prevent a court of equity from aiding its enforcement must not only relate to a material matter constituting an inducement to the contract, but it must relate to a matter respecting which the complaining party did not possess at hand the means of knowledge.; and it must be a misrepresentation upon which he relied and by which he was actually misled to his injury. * * Where the means of knowledge are at hand and equally available to both parties and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means and opportunities he will not be heard to say that he has been deceived by the vendor's misrepresentations. * * And the same rule obtains when the complaining party does not rely upon the misrepresentations but seeks from other quarters means of verification of the statements made and acts upon the information thus obtained": *Slaughter's Admr.* v. *Gerson,* 13 Wall. 379–383 (20 L. Ed. 627).

"If it appears that he, the purchaser, has resorted to the proper means of verification so as to show that he in fact relied upon his own inquiries or if the means of investigation and verification were at hand and his attention drawn to them, relief will be denied"—as cited by Mr. Justice BREWER in *Farnsworth* v. *Duffner,* 142 U. S. 43 (35 L. Ed. 931, 12 Sup. Ct. Rep. 164), quoting from *Ludington* v. *Renick,* 7 W. Va. 273.

Pomeroy's analysis of the subject is also set down by Judge WOLVERTON as follows:

"1. When, before entering into the contract or other transaction he actually resorts to the proper means of ascertaining the truth and verifying the statement. 2. When having the opportunity of making such examination, he is charged with the knowledge which he necessarily would have obtained if he had prose-

cuted with diligence. 3. When the representation is concerning generalities equally within the knowledge or the means of acquiring knowledge possessed by both parties."

In all such cases Pomeroy declares that a party will not be justified in relying upon representations made to him.

As stated by Mr. Justice RAMSEY in *McFarland* v. *Carlsbad Sanatorium,* 68 Or. 530 (137 Pac. 209, Ann. Cas. 1915C, 555):

"In this state the rule is settled by a long line of decisions that an action of deceit based on fraudulent representations cannot be maintained unless the representations were false and either known by the person making them to be false, or were made by him recklessly as of his own knowledge without knowing whether they were true or not with the intent that they should be acted on by the party seeking relief and such party believed them to be true and acted upon them and was injured"—citing many Oregon precedents.

In *Wimer* v. *Smith,* 22 Or. 469 (30 Pac. 416), it is laid down as a rule that a party seeking relief on the ground of fraud perpetrated upon him by means of false representations must not only clearly prove the fraud but must also show that he relied upon the false representations, and although such false representations were made as alleged yet if, having full means of knowing the truth, he acted on his own judgment in the transaction from which he seeks relief he cannot complain.

3. In the present instance, before making any contract whatever, the defendants had received and relied upon the statements of their friend Hart, who gave favorable accounts of the country and of the particular tract. This amounts to making independent investigation. Not only so, but in addition thereto, before

giving the note and mortgage in suit, the defendant Hull visited the premises and afterwards had the opportunity of actual occupation and cultivation to observe the conditions. At all times he was afforded every opportunity to pursue his quest and no obstacle was thrown in his way by the plaintiff. This feature distinguishes the instant case from those cited by the defendants such as *Aitken* v. *Bjerkvig,* 77 Or. 397 (150 Pac. 278), where the seller took active measures to disarm the buyer's suspicion and prevent his independent investigation. The digging of test holes could have been accomplished on Hull's first arrival upon the premises as easily as after the suit had been commenced. The means of knowledge were at hand for his inspection during the whole period of three years between the making of the original contract and the execution of the new contract embodied in the note and mortgage in question.

It is not necessary to decide whether the plaintiff should plead laches as an estoppel or not. The letters and conduct of the defendant Hull are at least entitled to great weight as deliberate admissions made against his own interest. In brief, a careful perusal of the testimony convinces us that the charges of fraud are not sustained by a preponderance of the testimony. Without dispute, it is shown that the promoters of the original tract gave it thorough examination and took the advice of experts upon its availability for horticultural purposes. They saw the ample growth of original forest upon it; in clearing the same and blasting out the stumps they discovered that the soil was deep and that the roots from the native trees went far into the earth. Under all these circumstances, the plaintiff was justified in the belief that the land was adaptable for horticultural purposes, especially when

they saw flourishing orchards on all sides of the property. The statements respecting the fertility of the soil were, therefore, not made recklessly or without well-grounded belief in their truth. It is not shown that the plaintiff knew the statement made in support of the property to be false and clearly it was not reckless in publishing the circular upon which alone the defendants rely for proof of fraudulent statements. Clearly the defendants have failed to prove the scienter or its equivalent of reckless statement which is an essential element of actionable fraud. A litigant *sui juris* must take reasonable care of his own concerns. Equity will not treat him as a nursling, otherwise there would be no stability in any contract.

4. While it is not controlling as a rule of law, yet much force is to be given to the principle laid down by the United States District Court of Appeals when the case of *Vanderbilt* v. *Bishop*, 188 Fed. 971, was before that court, the opinion of which is reported in 199 Fed. 420 (117 C. C. A. 652), to the effect that the findings of a trial judge, based on evidence of witnesses before him, resulting in a substantial conflict with respect to material issues, will not be set aside on appeal. In the present instance the trial judge visited and inspected the premises; he had before him the witnesses in person, with but few exceptions where the testimony was taken before the reporter as referee; and hence was in a very much better situation than we are rightly to decide the questions here involved. A careful perusal of the record compels us to respect his decision. Accordingly the decree of the Circuit Court is affirmed.

AFFIRMED.

McBRIDE, C. J., and BENSON and HARRIS, JJ., concur.