Argued November 3, 1977, reversed and remanded June 20, 1978

JACOBS ASSOCIATES, *Appellant,*

*v.*

ARGONAUT INSURANCE COMPANY, *Respondent.*

(No. A7611-15561, SC 25125)

580 P2d 529

James E. Peterson, Portland, argued the cause for appellant. With him on the brief was Black, Helterline, Beck & Rappleyea, Portland.

Paul R. Meyer, Portland, argued the cause for respondent. With him on the brief was Kobin & Meyer, Portland.

DENECKE, C. J.

Linde, J., specially concurring opinion.

Holman, J., dissenting opinion, joined by Bryson, J.

## DENECKE, C. J.

Plaintiff is an engineering firm which provided services used in construction of the Portland General Electric (PGE) Company headquarters building in Portland. The services were provided for Target Dredging and Piledriving Company. Target has since been adjudicated bankrupt without paying plaintiff $10,891.94 due under its subcontract. In accordance with its contract with PGE, Target secured a bond through defendant. After Target was adjudicated bankrupt, plaintiff instituted this action asserting that it was a third party beneficiary on the bond executed by defendant. Defendant demurred to plaintiff's complaint on the ground that it failed to state facts constituting a cause of action. The demurrer was sustained. Plaintiff refused to plead further. Judgment was entered for defendant and plaintiff appealed.

The bond at issue in this case is of standard form. After reciting that Target as principal and defendant as surety are bound to PGE in the sum of $820,771, the bond lists the "conditions" which will void the obligations. The bond recites: "NOW, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH that if the Contractor [Target] shall

"(a) Pay all persons, firms and corporations who perform labor or furnish equipment, supplies and materials for use in the work under the Contract;
"* * * * *.
"(d) Fully complete the work as provided in the Contract, free from all liens and claims of any kind whatsoever, and in all other particulars shall faithfully and fully perform the Contract on its part according to all the terms, covenants, and conditions thereof, and within the time specified therein;
"(e) Fully indemnify and save harmless the Owner [PGE] against and from all cost and damage which it may suffer by reason of a default in the performance of any of the foregoing provisions, and fully reimburse and

repay the Owner all outlay and expense which the Owner may incur in making good any such default;

then this obligation shall be void; otherwise the same shall remain in full force and effect."

■ It is clear that the conditions have not all been satisfied and that the bond remains in effect. The question, however, is whether plaintiff is party which may maintain an action on the bond.

Plaintiff candidly admits that the question was squarely answered in the negative by this court in *Tait & Co. v. D. Diamond Corp.,* 228 Or 602, 365 P2d 883 (1961). In *Tait* we recognized that our decision followed the minority rule and that our approach had been strongly criticized, but we felt that our prior decisions dictated the result. *Parker v. Jeffrey,* 26 Or 186, 37 P 712 (1894), and *Pankey v. National Surety Co.,* 116 Or 648, 239 P 808 (1925).

In *Parker* and *Pankey* we held we would not imply a promise to pay the third party plaintiff. We did not interpret the language of the bond to constitute a promise, only a condition.

This is the principal ground for the dissent; that is, that the surety did not promise to pay laborers and the words of condition are irrelevant on the issue of to whom the surety owes the obligation to pay.

The difficulty is caused by the archaic form which continues to be used in surety bonds. Most courts have not interpreted the archaic form literally but consider the words of condition to be words of promise. To do otherwise would be erroneous in instances even more obvious than in this case.

Corbin states:

"* * * The extent of this undertaking [of the surety] is to be determined not only by the surety's words of express promise, but also by the 'condition' of the bond. Words of 'condition' are not words of 'promise' in form; but in the case of a penal bond they must be construed to be words of promise, inasmuch as the only express words

of promise are those in which payment of the penal sum is promised. * * *." 4 Corbin, Contracts § 800, 173-174 (1951).

"* * * Words of 'condition' are not words of 'promise' in form; but in this class of cases it is sound policy to interpret the words liberally in favor of the third parties. In a majority of states, it is already done; and without question the surety's rate of compensation for carrying the risk is sufficiently adjusted to the law. The compensated surety has become an institution that is well suited to carry the risk of the principal contractor's default, whereas individual laborers and materialmen are frequently very ill prepared to carry the risk. The legislatures have recognized this fact, and in the case of public contracts have required surety bonds to protect the third parties. While this has not been done in the case of private construction, and while the courts should not on their own motion put such a provision into a private surety bond, they may well interpret a bond that is expressly conditioned on the payment of laborers and materialmen as being a promise to pay them and made for their benefit. The words reasonably permit it, and social policy approves it. * * *." Corbin, *supra,* at 177-178.

In *Socony-Vacuum Oil Co. v. Continental Casualty Co.,* 219 F2d 645, 647-648 (2d Cir 1955), the second circuit followed this view:

"It is true that in the bond here sued on the only expressly promissory words are those whereby the surety acknowledges itself bound to the prime contractor, as obligee, in the penal sum of $162,000. But since the bond is stated to be on condition that the principal— here the subcontractor — 'shall pay all labor and material obligations,' the words of the condition are the full equivalent of words of direct promise."

1 Restatement 154, Contracts § 133, Illustration 4, states:

"D contracts to build a house for A. A obtains from B a bond in which B promises A that all D's creditors for labor and materials who may acquire a lien on the house shall be paid. C is such a creditor of D's. C is a donee beneficiary."

Simpson, Contracts (2d ed), 252, n 57, states:

"Words of condition in a bond are necessarily construed as words of promise, since no words of express promise appear save that to pay the penal sum which is enforceable."

As stated, most courts are in agreement with these statements.

Some sureties have discarded the ancient form and inserted language expressly providing that unpaid laborers shall have a direct action against the bond. In our opinion this was not intended to change the surety's obligation from that stated in the archaic form but to express that same obligation in understandable language.

If the dissent is correct, that language in the bond in this case, "Pay all persons * * * who perform work * * *" does not amount to a promise to pay persons such as plaintiff, the quoted condition is completely superfluous. PGE does not need this condition for protection; it is fully protected by other conditions in the bond. Condition (d), before quoted, includes a requirement that the work shall be completed, free of all liens and claims. Condition (e) provides that the contractor shall fully indemnify PGE against damage suffered by reason of any default in contractor's performance. Because the above-quoted condition is unnecessary to protect PGE, the inference necessarily arises that it is a promise to pay an unpaid laborer or materialman.

Other forms of bonds continue to use the archaic words of condition rather than promise, yet it is even more obvious in some of those instances that the bond is for the protection of third parties. An example is the statutory bond required by ORS 657.100 for collection agencies.[1] The bond is written in the archaic language

---

[1] "The bond required by subsection (2) of ORS 697.070 shall be in the form substantially as follows:

of condition: "Now, therefore, if the said [collection agency] shall * * * pay to customers the net proceeds due and payable * * * then this obligation shall be void, otherwise to remain in full force and effect." The surety is expressly bound only to the State of Oregon.

There are no express words of promise to pay customers. The wording of the bond is legally identical to the bond in the present case. It seems clear, however, that the intention of the legislature was that the bond was for the benefit of unpaid creditors of the collection agency. If it were otherwise, only the state

"Know All men by These Presents that we, ____, as principal, and _____ as surety, are held and firmly bound unto the State of Oregon, in the penal sum of _____, ($____), lawful money of the United States, for the payment of which well and truly to be made we, and each of us, bind ourselves, our heirs, executors, administrators, successors and assigns jointly and severally, firmly by these presents.

"The condition of this obligation is such, that whereas, the above bounden principal has applied to the Real Estate Commissioner of the State of Oregon for a billing agency, factoring agency or collection agency license under the provisions of ORS 697.010 to 697.470, and is required by the provisions of that law to furnish a bond conditioned as herein set forth.

"Now, therefore, if the said ____ shall, within 30 days after the close of each fiscal or calendar month, report and pay to customers the net proceeds due and payable of all collections and receipts made during said calendar or fiscal month, and shall strictly, honestly and faithfully comply with the provisions of ORS 697.010 to 697.470, and all amendments thereof and supplemental thereto, now or hereafter enacted, then this obligation shall be void, otherwise to remain in full force and effect.

"This bond shall become effective on the ____ day of _____, 19____. The surety _____ may be relieved of future liability hereunder by giving 60 days' written notice to the principal and to the Real Estate Commissioner of the State of Oregon.

"This bond shall be one continuing obligation and the liability of the surety for the aggregate of any and all claims which may arise hereunder shall in no event exceed the amount of the penalty hereof.

"In Witness Whereof we have hereunto set our hands and seals at _____ in the State of Oregon, this ____ day of ____, 19____.

_____(SEAL)
Principal

_____(SEAL)
_____(SEAL)
Surety"

[ 557 ]

could bring an action on the bond and collect something in the nature of a fine or forfeiture. The statutes have no provision for the state using the proceeds of its collection to pay unpaid creditors of the collection agency.

We conclude, therefore, that our decisions in *Parker* and *Pankey* were incorrectly decided.

■ When an express promise to pay a third party has been found the subjective intent of the promisee, in this case PGE, is immaterial; the third party can maintain an action against the promisor surety. The general principle which is the basis for that proposition has always been the law in Oregon. "On the second point, the authorities with us are quite decisive that when A., for a valuable consideration, agrees with B. to pay his debt to C., the latter can enforce the contract against A." *Baker & Smith v. Eglin,* 11 Or 333, 334, 8 P 280 (1883).

This same principle applies to contracts of surety:

"* * * And thirdly, the third party has an enforceable right if the surety promises in the bond, either in express words or by reasonable implication, to pay money to him. If there is such a promissory expression as this, there need be no discussion of 'intention to benefit.' We need not speculate for whose benefit the contract was made, or wonder whether the promisee was buying the promise for his own selfish interest or for philanthropic purposes. It is a much simpler question: Did the surety promise to pay money to the plaintiff?" 4 Corbin, Contracts, *supra,* at 163-164.

■ In addition to the lack of persuasive precedents supporting *Tait,* it should be overruled because it failed to follow a recognized rule of the construction of contracts. The defendant in this case is a compensated surety; its business is writing surety bonds for a fee. The universal rule is that a compensated surety is regarded as an insurer and the contract it draws will be construed most strongly against it. *Hagey v. Mass. Bonding & Ins. Co.,* 169 Or 132, 159, 126 P2d 836, 127 P2d 346 (1942).

In *Tait* we chose not to repudiate our former decisions because we stated, "an untold number of surety contracts have been entered into in reliance upon the unequivocal holdings of this court," and we could not "judge the repercussions that could occur within the construction industry by an abrupt reversal of the rule." 228 Or at 604-605.

We are now of the opinion that in *Tait* we were unrealistic in our concern over the possible magnitude of the effect of repudiating our former decisions and since *Tait* the effect of repudiating our former decisions has been lessened by changes in the mechanic's lien laws. The only persons who are vitally interested in bringing an action on the payment provision of a bond are those who have no lien rights in the owner's property or who failed to perfect their lien rights. At the time of *Tait* most persons performing services for or furnishing material to a construction project had statutory mechanic's lien rights. ORS 87.010. Since *Tait* the legislature provided for lien rights for more classes of persons, including engineers such as plaintiff. (Plaintiff did not have lien rights at the time it performed the work for Target.) For these reasons the number of persons affected by a change would be small.

In addition, the defendant and other sureties can change the form of their bonds and clearly provide that unpaid engineers, laborers and materialmen have no right of action. This will not affect outstanding bonds; however, as we observed, this will not be of concern to many sureties or claimants.

If this were a "custom" contract, "tailor made" for these parties for this project, it is very unlikely that we would repudiate the interpretation reiterated in *Tait*. In that situation it would be likely that the parties relied upon our holding in *Tait* and wrote the clause accordingly. But that is not the situation in this case. This is a standard clause in bonds. It is not part of a contract of adhesion but it is not a clause that is

[ 559 ]

normally negotiated. Under these circumstances there is no reason we should not overrule our past decisions interpreting the clause to the contrary if we conclude the past decisions are clearly erroneous.

The surety argues that if we permit the plaintiff to have a cause of action, we are treating it more liberally than unpaid materialmen are treated in bonds which expressly provide that the unpaid materialman has a cause of action. In that latter type of bond the claimant is normally required to both give notice of claim and file suit within a short time after his claim has accrued. The present bond has no such requirements.

There is no showing that this defendant was in any way prejudiced because of the time when the plaintiff gave notice of claim to defendant or by the time when plaintiff filed its action. If defendant believes it advisable, it can provide in its future bonds a time which is reasonable within which notice of claim must be given and a lawsuit filed.

We hold that the plaintiff has a right of action against the surety. *Tait & Co. v. D. Diamond Corp., supra,* (228 Or 602), is overruled. Therefore, the demurrer should be overruled.

Reversed and remanded for setting aside the judgment for defendant and for further proceedings.

**LINDE, J.,** concurring.

The majority finds that the surety bond in this case makes "an express promise to pay a third party," though stated in the "archaic form" of conditions. The dissent, in turn, finds that the contract "is clear and unambiguous" and does not make such a promise. To me, it seems difficult to find a clause "express," "clear," or "unambiguous" on whose meaning this court divides, on which other courts have divided, and whose present interpretation may involve overruling prior decisions. To decide such a case as choice between

two "express," "clear," and "unambiguous" meanings in effect says that in selling and buying this "archaic" bond, the parties clearly understood something, but we disagree on what they clearly understood. That does not seem to me a question to be decided on the pleadings.

The allegations of plaintiff's complaint were sufficient to state a claim if PGE and defendant understood the bond in the manner contended for by plaintiff and adopted by the majority opinion. We do not know that those parties so understood the bond. Certainly, in light of *Tait & Co. v. D. Diamond Corp.*, 228 Or 602, 365 P2d 883 (1961), it is not self-evident. Plaintiff should have been allowed the opportunity to prove that this was the parties' understanding of the bond but was prevented by the order sustaining the demurrer. For this reason, I concur that the demurrer should have been overruled.

Lent, J., joins in this opinion.

**HOLMAN, J.,** dissenting.

The majority takes a condition of a bond and makes it a promise. The surety made no promise to pay parties other than the owner, Portland General Electric Company (PGE). The words of the contract provide that "* * * *if the Contractor* shall (a) Pay all persons, firms and corporations who perform labor or furnish equipment, supplies and materials for use in the work," there will be no obligation of the surety under the bond. (Emphasis added.) Thus, the language from the contract quoted by the majority provides no obligation upon the surety to pay but provides only that *if the contractor* pays, no obligation can exist under the bond. It is a provision for the benefit of the surety. The words are not words of promise on the part of the surety but are words which specify a condition which, if fulfilled, nullifies the surety's obligation. *They say nothing about to whom the surety owes the obligation.*

[ 561 ]

The words which indicate in whose favor the obligation runs are as follows:

> "KNOW ALL MEN that we, TARGET DREDGING & PILEDRIVING CO. of P. O. Box 17278, Portland, Oregon 97217, as Principal, hereinafter called the Contractor, and ARGONAUT INSURANCE COMPANY, a corporation organized under the laws of the State of California and duly authorized to transact business within the State of Oregon, as surety, hereinafter called the Surety, are jointly and severally held and *firmly bound unto* PORTLAND GENERAL ELECTRIC COMPANY, 621 S.W. Alder, Portland, Oregon 97205, its successors and assigns, as obligee, hereinafter called the Owner, in the sum of EIGHT HUNDRED TWENTY THOUSAND SEVEN HUNDRED SEVENTY ONE AND NO/100 ($820,771.00) DOLLARS lawful money of the United States *for the payment whereof to the Owner* the Contractor binds itself, its successors and assigns, and *the Surety binds itself,* its successors and assigns firmly by these presents.
>
> "* * * * *." (Emphasis added.)

We have three cases which hold contrary to the majority opinion: *Tait & Co. v. D. Diamond Corp.,* 228 Or 602, 365 P2d 883 (1961); *Pankey v. National Surety Co.,* 115 Or 648, 239 P 808 (1925); and *Parker v. Jeffery,* 26 Or 186, 37 P 712 (1894). These decisions were based upon the language of the agreements which shows, as does the language under consideration here, that there was no promise to benefit any party other than the owner. In view of the quoted language from the agreement, I do not understand how the majority comes to the conclusion that the contracting parties intended that the bond should also run in favor of someone else. A contract is a matter of the intention of the parties, and there is no evidence here that this contract was intended to beneift anyone other than PGE. The contract, although drawn in an archaic form, is clear and unambiguous.

In *Pankey v. National Surety Co., supra* at 651-52, this court said:

"* * * [I]t seems clear that plaintiff cannot maintain this action, because there was no promise by the National Surety Company to pay for labor and material used by Nettleton-Bruce-Eschbach Company in the performance of its contract with the railway company, nor was the bond taken by the railway company for the benefit of parties who might furnish such labor or material, but to indemnify and save it harmless from loss or damage by the failure of the Nettleton-Bruce-Eshbach Company to perform its contract. The obligation of the Nettleton-Bruce-Eschbach Company is measured by the terms of its contract, which is an ordinary penal bond by which it acknowledges itself indebted to the railway company in the sum of $25,000, and which it binds itself to pay to the obligee in the bond, and not to any other person. The condition that it Nettleton-Bruce-Eschbach Company should comply with its contract with the railway Company, the obligation should be void, is incorporated in the bond for the benefit of the surety. It simply declares upon what terms it may be exonerated from its liability to the railway. The bond contains no covenant or agreement to pay the plaintiff, or to see him paid, but only a condition, the performance of which will exonerate the Surety Company from liability, and such a condition will not be constured as a promise."

In *Parker v. Jeffery, supra* at 191, this court said:

"* * * The condition that if Robertson Brothers should comply with their contract with the city, the obligation should be void, is incorporated in the bond for the benefit of the sureties. It simply declares upon what terms they may be exonerated from their liability to the city. The bond contains no covenant or agreement to pay the plaintiffs, or to see them paid, but only a condition, the performance of which will exonerate them from liability, and such a condition will not be construed as a promise * * *."

The language quoted above is as true today as it was when written. There is no logical way to make the language of the contract benefit anyone other than PGE.

The purpose of a bond of this kind is to save an owner harmless from the expense of clearing liens

[ 563 ]

which might be filed upon the premises being constructed. A bond of this kind is given because those in the position of PGE require it for their protection. The premium on the bond is a cost of doing business and is reflected in the contractor's bid. Neither the contractor nor the owner is interested in enhancing the premium, and thus the amount of the bids on the property being constructed, by securing coverage for anyone other than the owner. Unless the milk of human kindness runs thicker in the veins of public utilities and contractors than is generally apparent, there is no real basis for believing there was an intention to benefit anyone other than PGE. Prior opinions of this court have construed similar contracts in accordance with the literal terms of such contracts, and we must assume that the parties entered into this contract in reliance upon those opinions. As demonstrated by the appendix to defendant's brief, there are other forms which are used when the parties wish to enter into a surety agreement for the benefit of third party workmen and materialmen.[1]

If there is an ambiguity, because of the archaic form of the bond, as to what the parties intended, it would be proper to submit proof showing what the parties did intend. Whether the parties intended those

---

[1]The American Institute of Architects' form for a bond, which is intended to benefit laborers and materialmen, reads, in part, as follows:

"KNOW ALL MEN BY THESE PRESENTS: that ____ as Principal, hereinafter called Principal, and ____ as Surety, hereinafter called Surety, are held and firmly bound unto ____ as Obligee, hereinafter called Owner, *for the use and benefit of claimants as hereinbelow defined,* in the amount of ____." (Emphasis added.)

Claimants are thereafter defined as laborers and materialmen. It is thus demonstrated that those in the trade are capable of entering into a contract for the benefit of third persons if this is their intention.

The majority opinion responds to the use of a bond, such as that illustrated above, as follows:

"Some sureties have discarded the ancient form and inserted language expressly providing that unpaid laborers shall have a direct action against the bond. In our opinion this was not intended to change the surety's obligation from that stated in the archaic form but to express that same obligation in understandable language." 282 Or at 556, 580 P2d at 531.

I would only ask: From what evidence is the majority's opinion formed?

in the position of plaintiff to be beneficiaries would then be a question of fact. However, even if the contract is treated as being ambiguous, plaintiff is in no position to recover in the face of the literal wording of the bond and in the absence of evidence that the parties intended otherwise. The majority not only construes the wording contrary to its literal meaning but it does so *as a matter of law* without the necessity of evidence that the words of condition were intended as words of promise. I have no quarrel with the law of third party beneficiary contracts as stated by the majority nor with its application to plaintiff if such was the intent of the parties, but that intent cannot be conjured out of the language of the contract.

The majority contends it was not necessary that the condition, which it construes as a promise, be in the contract unless it was intended as a promise. I would counter by contending that if the parties intended to benefit anyone other than PGE, they would have said so instead of using words of condition. In addition, we know that sureties state everything at least three different ways because courts construe contracts against them if such contracts do not completely cover every possible contingency. We now hold that any duplication arising out of any statements made by sureties will be construed against them.

In an attempt to strengthen its position, the majority also argues that the contract in question is analogous to the form of the statutory bond required by ORS 697.100 which protects persons who deal with collection agencies. It is an inapposite analogy because the statutory bond runs in favor of the state which has no interest in any particular dealing with the collection agency and whose only interest is the protection of the public. The bond must necessarily be for the benefit of the public; it serves no purpose otherwise. PGE, on the other hand, has an interest in seeing that there are no unpaid liens.

[ 565 ]

The majority also relies upon the holding of *Hagey v. Mass. Bonding & Ins. Co.,* 169 Or 132, 159, 126 P2d 836, 127 P2d 346 (1942), which holds that surety contracts made by compensated sureties " ' * * * will be construed as an insurance contract most strongly in favor of the *party or parties protected thereby.'* In other words, a compensated surety is taken at his word." (Emphasis added.) This would be a proper rule of construction for application to the parties intended to be benefited by the contract, but it is no help to us in deciding who the benefited parties were intended to be. If a compensated surety is "taken at its word" in this case, there is no liability. It is only when words are put in its mouth that liability results.

Relied upon by the majority is the text of Professor Corbin's work on Contracts, wherein it is stated,

"* * * in the case of a penal bond [words of condition] must be construed to be words of promise, inasmuch as the only express words of promise are those in which payment of the penal sum is promised. * * *." 4 Corbin, Contracts § 800, at 173-74 (1951).

Corbin does not attempt to explain why there should be implied promises in addition to the promise of payment of the penal sum to the named beneficiary (in this case PGE). A reading of the text preceding and following the quoted material makes it apparent that his reason for such a statement is that he believes a better social result would follow if sureties were made responsible to all claimants—not because he believes the parties to such a contract usually intend to so agree.

The majority's result is appealing because the bonding company can distribute the risk through premiums and because it is a way of assuring the payment of all workmen and materialmen. Whether one wants to twist the words to reach what is considered a good social result depends upon how important one considers the right of the parties to make their own contract. This is the kind of public policy that is

usually handled by legislatures, and the law has been settled in this state for 95 years without any legislative action.

Bryson, J., joins in this dissenting opinion.